IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT L. PEARCE,

Plaintiff,

v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social Security,

Defendant.

No. 16 C 9820

Magistrate Judge Sidney I. Schenkier

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Robert Pearce, seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits (doc # 22). The Commissioner has filed a cross-motion for summary judgment (doc # 24). For the reasons set forth below, we grant Mr. Pearce's motion to remand and deny the Commissioner's motion to affirm.

### I.

Mr. Pearce filed his application for benefits on September 24, 2012, alleging he became disabled on September 1, 2012 (R. 150-57).[3] After his claim was denied initially and upon reconsideration, Mr. Pearce received a hearing before an Administrative Law Judge ("ALJ") on June 11, 2014 (R. 32-65). On October 24, 2014, the ALJ issued a written decision finding Mr. Pearce was not disabled from September 1, 2012 through the date of the decision (R. 14-26). The

---

[1]Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

[2]On December 20, 2016, by consent of the parties and pursuant to 28. U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 8).

[3]Mr. Pearce initially claimed an onset date in July 2011, but in October 2012, he amended his onset date to September 1, 2012 (R. 150-57).

Appeals Council upheld the ALJ's determination, making it the final opinion of the Commissioner (R. 1-4). *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

Since at least 2007, Mr. Pearce has seen Gerald Lofthouse, M.D., or one of his partners at Bolingbrook Family Medicine (*see* R. 344-84). Mr. Pearce is obese at 5'8" tall and 235 pounds (R. 19), and he is a chronic smoker. He has a history of Gastroesophageal Reflux Disease ("GERD") and hypertension, but both have been mostly controlled with medication since 2009 (R. 367-69). Since 2010, Mr. Pearce has reported experiencing fatigue, malaise and chest pain, and a sleep study showed that he had chronic obstructive pulmonary disease ("COPD") and sleep apnea (R. 356-57, 362-66). In addition, since at least March 2009, Dr. Lofthouse has prescribed Prozac (fluoxetine) to treat Mr. Pearce's chronic depression (R. 359, 366).

On November 21, 2012, Seth Osafo, M.D., performed a consultative physical examination of Mr. Pearce (R. 314-23). Mr. Pearce indicated that his depression was under good control with Prozac, but that he lacked the strength and energy to work and the ability to walk or stand for any length of time because his lower back and knees hurt and he was short of breath (R. 318). Dr. Osafo's physical examination was essentially normal (R. 321-22).

On November 27, 2012, Mr. Pearce underwent a consultative psychological evaluation by Glen Wurglitz, Psy.D. (R. 306-09). Mr. Pearce reported that he had been depressed since 2002, but he did not receive any psychiatric treatment; rather, his depression was managed by his primary care physician (R. 306). Mr. Pearce stated that he could cook, wash dishes, clean house, vacuum, do laundry, drive a car, shop alone, take care of his pets, bathe and dress himself, and he could concentrate on a task until it was finished (R. 307-08). On examination, Dr. Wurglitz noted

2

that Mr. Pearce's mood was euthymic (normal, non-depressed); he had excellent short-term memory, good delayed memory, good abstract reasoning and judgment, and below average immediate memory (R. 308). Dr. Wurglitz diagnosed Mr. Pearce with moderate, recurrent major depressive disorder, but opined that his depression was being effectively managed by psychotropic medication monitored by his primary care provider (R. 309).

On December 12, 2012, a non-examining state agency physician reviewed the physical consultative examination and determined that Mr. Pearce's physical impairments were not severe (R. 70). A non-examining state agency physician opined that Mr. Pearce had a physical residual functional capacity ("RFC") to perform a modified range of medium work (R. 84-85).

Also on December 12, 2012, another non-examining state agency physician reviewed the psychological consultative examination and found that Mr. Pearce had a severe impairment of depression, with mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace (R. 70-71). The state agency physician concluded that Mr. Pearce would be "limited to performing more routine tasks as a result of the depression and preoccupation with pain" (R. 73). This mental health assessment was affirmed on reconsideration (R. 85-87).

On December 31, 2012, Mr. Pearce returned to Dr. Lofthouse. Physically, Mr. Pearce reported constant, aching pain in his ankles and feet, which decreased his mobility and made it difficult for him to sleep; he said that taking "about 2,000 mg of ibuprofen daily" did not help (R. 350). Examination showed decreased breath sounds and an unsteady, unbalanced gait (R. 354). On mental status examination, Dr. Lofthouse noted that Mr. Pearce had a depressed affect, anhedonia (inability to feel pleasure), feelings of hopelessness, moderately impaired short term memory, poor insight and judgment, and poor attention span and concentration (*Id.*). Mr. Pearce

3

also described symptoms including decreased activity, lethargy and malaise (R. 352). Dr. Lofthouse again prescribed Prozac (R. 354).

On April 8, 2013, Dr. Lofthouse filled out a "pulmonary" RFC questionnaire (R. 339). Dr. Lofthouse listed Mr. Pearce's diagnoses as COPD and neuropathy, and indicated that emotional factors contributed to the severity of Mr. Pearce's symptoms and functional limitations (R. 339-40). He opined that Mr. Pearce's pain and other symptoms would constantly interfere with the attention and concentration needed to perform even simple work tasks, and he would be incapable of even "low stress" jobs (R. 340). Dr. Lofthouse opined that Mr. Pearce would need to take multiple 10-minute long unscheduled breaks per day and would likely miss more than four days of work per month due to his impairments or treatment (R. 342). Dr. Lofthouse gave Mr. Pearce a very poor prognosis, as his condition was "progressive" (R. 340).

On July 17, 2013, Mr. Pearce reported to Dr. Lofthouse that his ankles "hurt[] like sprained ankles when walking, even short distances" (R. 344). Dr. Lofthouse refilled Mr. Pearce's prescription for hydrocodone (Norco) because it helped him to sleep and "fairly" controlled his symptoms (R. 344). Dr. Lofthouse also observed that Mr. Pearce had inappropriate mood and affect but normal judgment and insight, and Mr. Pearce reported symptoms of malaise, poor sleep, lack of energy, and depression (R. 346-48). Dr. Lofthouse increased Mr. Pearce's dosage of Prozac because his mental health symptoms were "poorly controlled" (R. 344, 348).

On September and November 2013, Mr. Pearce reported to Dr. Lofthouse that he had moderate back and ankle pain and shortness of breath (R. 376, 384). Dr. Lofthouse refilled Mr. Pearce's Norco prescription but instructed him to start weaning off Norco and add Voltaren (diclofenac sodium, a nonsteroidal anti-inflammatory drug for mild to moderate pain) (R. 376). Mr. Pearce continued to take Prozac for depression (R. 384, 387).

In January 2014, Mr. Pearce switched medical providers and began treating at VNA Healthcare (R. 385). He was prescribed Symbicort, Prozac, Norco and diclofenac sodium, among other medications (R. 387-88). On March 13, 2014, Mr. Pearce returned to VNA Healthcare, reporting severe back pain, extreme sleepiness and lack of energy, numbness in his lower extremities and intermittent chest pain (R. 446-47). In March and April 2014, Mr. Pearce was evaluated by two orthopedic surgeons for severe back pain; both recommended physical therapy but not surgery (R. 466-67, 469-71).

On April 15, 2014, Mr. Pearce returned to VNA Healthcare, complaining of severe, sharp back and bilateral hip pain (R. 440). Mr. Pearce appeared unkempt and in moderate pain or distress, and examination revealed hip and low back pain, joint tenderness, and decreased range of motion (R. 443). He was instructed to continue his medications as prescribed, including Prozac for his depression and Norco and diclofenac sodium for pain (R. 444). On May 28, 2014, Mr. Pearce returned to VNA Healthcare with similar symptoms; his prescriptions were refilled and he was referred for pain management (R. 435, 438). In June 2014, Mr. Pearce twice went to the emergency room for severe back pain (R. 483, 479). Both times he received a narcotic injection and discharged home (R. 485-86). At the latter visit, Mr. Pearce discharged with a prescription for Valium (R. 481).

At the hearing before the ALJ on June 11, 2014, Mr. Pearce testified that he experienced "astronomical" pain, chest discomfort, shortness of breath and sleep apnea on a daily basis (R. 44, 47-51). He wore ankle braces because his ankles were very weak; he could usually only stand for a few minutes and sit for about 20 minutes at a time (R. 52-54). Mr. Pearce testified that his anti-depressant medication no longer worked; he had no energy and no longer went out like he

used to (R. 53). He was able to do laundry and prepare basic meals but he often received help shopping and could no longer walk his dogs (R. 55-57).

### III.

In her October 24, 2014 opinion, the ALJ followed the familiar five step process for determining disability. The ALJ determined that Mr. Pearce has not engaged in substantial gainful activity since September 1, 2012, the alleged onset date (R. 16). The ALJ then found Mr. Pearce suffered from the following severe impairments: obesity, COPD, lumbar degenerative disc disease with sciatica, sleep apnea, hypertension, and mitral valve regurgitation (*Id.*).

The ALJ found that Mr. Pearce's "medically determinable impairment of depression" did not cause more than minimal limitations and was therefore not severe (R. 17). The ALJ provided the following reasons for this finding: (a) Mr. Pearce "has been on the same medications for a long time and the record does not reflect a worsening of his condition;" (b) he has not seen a mental health professional, but receives his medication from his primary care physician; and (c) state agency evaluations in November 2012 found that Mr. Pearce's depression was effectively managed by Prozac (*Id.*). The ALJ "recognize[d] that in July 2013, the claimant reported that his Prozac was not effective. However, in March 2014 he stated that his depression was not getting worse," and he "did not consistently complain of depression to his primary care physician" (*Id.*). The ALJ found that Mr. Pearce had only mild limitation in activities of daily living because he could drive, do laundry, prepare himself meals, and do household chores, even though "the chores take him several hours" (*Id.*). The ALJ also found that Mr. Pearce had mild limitation in social functioning because he spent time with others and had conversations over the phone or computer, and only mild limitation in concentration, persistence, or pace based on the state agency psychological examination (R. 18).

The ALJ next found that Mr. Pearce did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (R. 18). The ALJ noted that she had considered "the cumulative effects [of] the claimant's obesity [] on his impairments (specifically, his back pain)," but found that there was no evidence of listing level severity (R. 19). The ALJ then determined that Mr. Pearce had the RFC to perform light work except that he: could not climb ladders, ropes, or scaffolding; was limited to occasional balancing and frequent but not constant climbing of ramps and stairs; and could not have concentrated exposure to dangerous moving machinery or respiratory irritants (*Id.*). The ALJ stated that she restricted Mr. Pearce to light work, rather than medium work as found by the state agency doctor, because of his obesity and the combination of his severe and non-severe impairments (R. 22). The ALJ explained that her finding of only mild limitations in the Paragraph B assessment did not warrant any non-exertional mental limitations (*Id.*).

The ALJ summarized Mr. Pearce's symptoms as he reported them to various medical professionals and also as he described them at the hearing, and determined that while Mr. Pearce's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely credible" because his allegations of extreme pain were not supported by "objective" medical findings, including examination and testing results (R. 19-23).

The ALJ then considered the various physician reports in the record. The ALJ gave some weight to the state agency opinion limiting Mr. Pearce to medium work and little weight to Dr. Osafo's opinion (R. 23-24). The ALJ assigned no weight to the RFC opinion of Mr. Pearce's primary care physician, Dr. Lofthouse, stating that those limitations were extreme compared to Mr. Pearce's examination findings and the overall record (R. 24-25). The ALJ also assigned no

7

weight to the state agency opinions finding that depression was a severe impairment and limiting Mr. Pearce to performing routine work because those opinions relied "almost exclusively on the consultative examination in rendering their opinion," but "the longitudinal evidence later submitted shows the claimant has been on the same medication for a long time, with good control and no worsening of his depression" (R. 24). The ALJ stated that Mr. Pearce "was able to work with the impairment for many years and there is no indication during the relevant time period that his depression worsened or that he needed to seek help from a mental health professional," and Mr. Pearce represented that he finished what he started (*Id.*). The ALJ gave little weight to Dr. Wurglitz's opinion finding that Mr. Pearce had a GAF score of 60 -- which would support a moderate mental impairment -- because this score was of "little value in determining disability" and contrasted to Dr. Wurglitz's finding that Mr. Pearce's depression was effectively managed (*Id.*). Ultimately, the ALJ determined that Mr. Pearce was not under a disability from September 1, 2012 through the date of the decision (R. 25-26).

## IV.

We review the ALJ's decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alvarado v. Colvin,* 836 F.3d 744, 747 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin,* 743 F.3d 1118, 1121 (7th Cir. 2014).

Mr. Pearce argues that reversal and remand is warranted for several reasons. Here, we focus on one argument that requires remand: that the ALJ erred in evaluating Mr. Pearce's depression. Mr. Pearce contends that the ALJ erred in assessing his mental functional capacity primarily by: (a) relying on "her own medical judgments" regarding Mr. Pearce's mental health rather than on "documented medical evidence," (b) "cherry-pick[ing] evidence to suit her conclusions," and (c) giving too much weight to Mr. Pearce's activities of daily living (doc. # 23: Pl's Br. at 6-8, 11). We agree.

### A.

The ALJ determined that Mr. Pearce's "medically determinable impairment of depression" was not severe because it caused only mild limitations in the Paragraph B functional areas (R. 17-18). The ALJ stated that because she found only mild limitations in the Paragraph B areas, no mental limitations were included in Mr. Pearce's RFC (R. 22). We agree with Mr. Pearce that the ALJ failed to adequately support that determination with evidence in the record.

The ALJ assigned zero or little weight to all of the medical records relating to Mr. Pearce's mental health. She assigned no weight to the opinions of the state agency psychological consultants who found that Mr. Pearce had a severe impairment of depression, which resulted in moderate limitations in concentration, persistence and pace. The ALJ gave no weight to the opinion of Mr. Pearce's treater, Dr. Lofthouse, that Mr. Pearce's pain and other symptoms would constantly interfere with the attention and concentration needed to perform even simple work tasks (R. 24-25). The ALJ also assigned little weight to Dr. Wurglitz's opinion that Mr. Pearce was moderately impaired due to depression (R. 24).

The ALJ's rejection of the medical experts' mental health opinions "left an 'evidentiary deficit' that the ALJ was not entitled to fill with h[er] own lay opinion." *Brown v. Berryhill*, No.

15 C 10160, 2017 WL 987366, at *7 (N.D. Ill. Mar. 14, 2017) (quoting *Suide v. Astrue*, 371 Fed. App'x 684, 689-90 (7th Cir. 2010)). It is well-settled that "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). Here, however, the ALJ dismissed all of the medical opinions related to Mr. Pearce's mental health, "and without an opinion from another medical expert, the ALJ erred by then offering h[er] own medical opinion" that Mr. Pearce's depression was not severe and did not warrant any mental limitations in his RFC. *Brown*, 2017 WL 987366, at *7 (citing *Murphy ex rel. Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)).

**B.**

In addition, Mr. Pearce contends that the ALJ supported her conclusions by "emphasizing those elements of the physicians' notes that centered on feeling better, improvement, problem resolved, and the like, but ignoring notations contrary to her conclusions" (Pl.'s Br. at 11). It is well-settled that "[a]n ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016). "This cherry-picking is especially problematic where mental illness is at issue, for a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about his overall condition." *Id.* (internal citations and quotations omitted).

The ALJ stated that "there is no indication during the relevant time period that [Mr. Pearce's] depression worsened," and she noted that Dr. Wurglitz had opined that Mr. Pearce's depression was effectively managed with medication (R. 24). While the ALJ "recognize[d] that in July 2013, the claimant reported that his Prozac was not effective," the ALJ did not credit that report because in March 2014, Mr. Pearce stated that his depression was not getting worse and

10

the ALJ found that Mr. Pearce "did not consistently complain of depression to his primary care physician" (R. 17).

Contrary to the ALJ's determination, Dr. Lofthouse often noted Mr. Pearce's complaints of depression and consistently prescribed him Prozac. In addition, the ALJ ignored Dr. Lofthouse's observations in December 2012 and July 2013 that Mr. Pearce's affect was depressed or inappropriate, and that he felt hopeless and had poor attention and concentration (R. 354). Indeed, the ALJ failed to note Dr. Lofthouse's decision in July 2013 -- some eight months after the opinion by Dr. Wurglitz that Mr. Pearce's depression was effectively managed with medication -- to increase Mr. Pearce's dosage of Prozac because his mental health symptoms were poorly controlled (R. 346-48).[4]

Moreover, while Dr. Wurglitz opined that Mr. Pearce's depression was effectively managed with medication, Dr. Wurglitz -- unlike the ALJ -- recognized that Mr. Pearce suffered moderate limitations from his depression. "An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Furthermore, Dr. Wurglitz examined Mr. Pearce only one time, and thus did not have the "longitudinal view" of Mr. Pearce that a treater such as Dr. Lofthouse would possess. *See Scrogham v. Colvin*, 765 F.3d 685, 688 (7th Cir. 2014). That is particularly important when dealing with a mental health

---

[4] The ALJ also noted that Mr. Pearce had not seen a mental health professional, apparently in support of the ALJ's determination that Mr. Pearce's depression was not severe (R. 17, 24). However, the fact that Mr. Pearce did not see a mental health professional is not probative of the severity of Mr. Pearce's symptoms in the absence of any exploration into the reasons why he did not see one, especially because Mr. Pearce was receiving prescribed anti-depressant medication from his primary care physician. *See O'Connor-Spinner v. Colvin*, 832 F.3d 690, 696 (7th Cir. 2016) (criticizing ALJ's finding that the claimant lacked mental health treatment where "throughout that time she was taking antidepressants that only a medical provider treating her depression would have prescribed"). *See also Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (holding that ALJ erred in concluding that gap in treatment showed claimant's symptoms were not as severe as she alleged because the ALJ did not explore the claimant's reasons for not seeking treatment).

11

condition because "a person who suffers from a mental illness will have better days and worse days . . ." *Meuser*, 838 F.3d at 912.

## C.

Finally, the ALJ erred in her assessment of the importance of Mr. Pearce's activities of daily living as they might shed light on his ability to work. Although there is not an "absolute prohibition" against considering a claimant's self-reported daily living activities, the Seventh Circuit has "repeatedly cautioned against equating daily living activities with the ability to perform a full day of work, as the former are often subject to different restraints (*e.g.*, longer periods within which to complete and more frequent opportunities to rest) . . ." *Brown v. Colvin*, 845 F.3d 247, 253 (7th Cir. 2016).

The ALJ found that Mr. Pearce had only mild limitation in activities of daily living because he could do various chores, even though "the chores take him several hours" (R. 17). However, as Mr. Pearce points out, his ability to perform chores over several hours does not show that he had only mild functional limitations that would allow him to perform a full-time job with no restrictions in his RFC. "The ALJ failed to acknowledge and account for those crucial differences . . . or at least there is no indication in the record that [s]he did." *Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016).

## CONCLUSION

Therefore, for the reasons stated above, we grant Mr. Pearce's motion to remand (doc # 22) and deny the Commissioner's motion to affirm (doc # 24).[5] The case is remanded for further

---

[5]Because we remand for the foregoing reasons, we express no view as to the other arguments that Mr. Pearce raised.

proceedings consistent with this opinion. The case is terminated.[6]

ENTER:

_____
Sidney I. Schenkier
United States Magistrate Judge

Dated: October 31, 2017

---

[6]We reject Mr. Pearce's alternative request for a reversal with an award of benefits. "An award of benefits is appropriate . . . only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allard v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). Here, factual issues have not yet been resolved, and we are not prepared to say that Mr. Pearce must inevitably be found disabled. We leave that determination to the ALJ on remand.